UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINA HOWE, as Personal Representative
For the Estate of SALVATORE CIPOLLONI,

Plaintiff,

Case No. 24-cv-12022

v.

HON. MARK A. GOLDSMITH

MATTHEW WILSON et al,

Defendants.
_____________________________/

**OPINION & ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 45)**

Before the Court is Defendants Matthew Wilson, Ashley Kusnir, and the City of Dearborn's motion for summary judgment. (Dkt. 45). Plaintiff Christina Howe, as personal representative of the estate of Salvatore Cipolloni, brought this action against Wilson and Kusnir, both Dearborn police officers, alleging excessive force, deliberate indifference, and failure to intervene in violation of his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983; she also asserts a gross negligence claim under Michigan law. See Compl. (Dkt. 1). In addition, a claim under Monell v. Dep't of Social Servs., 436 U.S. 658 (1978) is asserted against the City of Dearborn. Compl. at PageID.15–16. Defendants seek summary judgment as to all counts against them.[1] See Mot. For the reasons that follow, the Court grants the motion in part, awarding

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing also includes Howe's response (Dkt. 54) and Defendants' reply (Dkt. 55). Defendants' motion includes videos from Kusnir's and Wilson's body worn cameras (BWC) and a clip from the Falcon Inn's security camera. See 10/23/2025 Text-Only Notice. The Court refers to these video items as "Kusnir BWC," "Wilson BWC," and "Security Video," all of which can be accessed via the Clerk's Office.

summary judgment to Defendants on the federal claims, but denies it in part as to the state-law claim, which is dismissed without prejudice.

## I. BACKGROUND

The following facts are not in dispute.

Wilson responded to a call from the Falcon Inn Motel in Dearborn, Michigan on September 23, 2021, reporting that there was a male outside Room 39 "holding the door preventing someone from leaving." CAD Rpt. at PageID.1206 (Dkt. 45-2). As revealed by Wilson's body worn camera, he arrived at the motel and spoke with the manager who told him that "there was one lady, I thought she was inside . . . she came outside but he was holding the door and saying 'help me, help me, help me' . . . I think he has some mental issue, 39, room number 39." Wilson BWC at 0:34–0:50. Wilson proceeded to find the individual who was the subject of the call—later identified as Cipolloni. Id. at 0:50–2:00.

When Wilson reached the vicinity of room 39, Cipolloni was behind an emergency exit door, in a stairwell, and was grunting. Id. at 1:21–4:50. Wilson testified that Cipolloni was pressing his weight against the door and preventing Wilson from opening it. Wilson Dep. at PageID.1210 (Dkt. 45-2). Wilson shouted to Cipolloni through the door, "what's the matter?" and Cipolloni responded, "help!" to which Wilson shouted back, "I'm here to help you!" and "let me open the door!" Wilson BWC at 1:21–4:50. Cipolloni continued grunting and shouting "help!" Id. Wilson repeatedly stated, "sir, I am here to help you" and "calm down," while Cipolloni continued grunting and screaming for help and to "let him in." Id.

Wilson later testified that he "[t]ried to use the best of my verbal skill I could [sic] to let Mr. Cipolloni know that I was there to help him and to continue to relate to him verbally like that." Wilson Dep. at PageID.1209. He also stated that he was "trying to get medical help to him and

get him secure so there could be medical help that could arrive." Id. And that before he reached the door he had "asked rescue to stage"—meaning that the Dearborn Fire Department was on site and standing by until the scene was secure and they could come evaluate Cipolloni. Id. at PageID.1209–1210.

After pleading with Cipolloni for about three minutes, Wilson breached the door and told Cipolloni to "come here man." Id. at 4:50–5:00. Grabbing Cipolloni by the hood of his sweatshirt, Wilson told Cipolloni to get "on the ground;" after Wilson felt Cipolloni resisting him, Wilson pushed Cipolloni to the ground. Id. at 4:50–5:05; Wilson Dep. at PageID.1221.

Once on the ground, Cipolloni immediately started struggling with Wilson—a struggle that continued for approximately five minutes. Id. at 5:00–9:55. About a minute into the struggle, Kusnir appeared on the scene to help Wilson. Id. at 6:30. Wilson and Kusnir struggled with Cipolloni for approximately five minutes before they were able to handcuff him. Id. at 9:40–9:55 (Kusnir stating "there we go," and the handcuffs click). During this time, Cipolloni remained non-compliant—flailing his arms and legs and grunting. Id. at 5:00–9:55. When Wilson and Kusnir were finally able to handcuff Cipolloni, he was on his stomach with his hands behind his back. Id. at 9:40–9:55.

After the handcuffs were attached, Cipolloni appeared to stop resisting. Id. at 9:55. Wilson stood to catch his breath, id. at 10:24, and Kusnir can be seen on the ground with one knee on Cipolloni, holding his hands near the handcuffs. Id. at 10:22.

Because of the angle they are taken, none of the videos on record show precisely how long Kusnir's knee was on Cipolloni's back. However, the videos do show approximately how long Cipolloni was on his stomach. Thus, the Court can deduce the maximum possible time that Kusnir

was kneeling on Cipolloni's back. It appears from Wilson's body worn camera that Cipolloni is only on his stomach for approximately 110 seconds. Wilson BWC at 9:30–11:20.

During the struggle, Wilson and Kusnir attached one set of handcuffs to one of Cipolloni's hands. After a second pair of handcuffs was fully attached to both of Cipolloni's hands, Wilson removed the first pair of handcuffs. Id. at 10:35–11:15.[2]

As soon as Wilson removed the first pair of handcuffs, Kusnir stated, "we need to roll him . . . " as she noticed that Cipolloni had lost consciousness. Id. at 11:15–11:20. Wilson and Kusnir then immediately rolled Cipolloni to his side and Wilson radioed, "Narcan." Id. at 11:20–11:26. They then worked to remove the handcuffs they have just attached. Id. at 11:30–12:03. Kusnir stated, "he has a pulse." Id. at 11:45–11:48.

After they removed his handcuffs, Wilson and Kusnir rolled Cipolloni to his back and Wilson rubbed his chest and told Cipolloni loudly to "get up." Id. at 12:10–12:30. The total time of Cipolloni's struggle with the officers lasted approximately five minutes. Wilson BWC at 5:00–9:55.

The arrival of paramedics and their efforts to revive Cipolloni are not shown on video. Hospital records state that Cipolloni had been given Narcan and was undergoing CPR for thirty minutes prior to his arrival in the emergency room. Corewell Hospital Record at PageID.538, 541 (Dkt. 45-1). Sixteen minutes after arriving in the emergency room, Cipolloni was pronounced dead. Id. at PageID.543.

[2] Kusnir explained in her deposition that Wilson had to remove the single handcuff because it was "dangerous" to Cipolloni and them as it could have been used as a weapon. Kusnir Dep. at PageID.1269 (Dkt. 45-2).

## II. ANALYSIS[3]

### A. Federal Claims

Pursuant to 42 U.S.C. § 1983, Howe brings three claims against Wilson and Kusnir: excessive force, deliberate indifference to medical needs, and failure to intervene. Compl. at PageID.7–14. She also brings a Monell claim against the City of Dearborn alleging that the City failed to train its officers and/or failed to affirmatively ensure its officers followed its policies. Id. at PageID.15–16. For the reasons that follow, the Court grants summary judgment as to all federal claims.

#### 1. Claims Against Wilson and Kusnir

To establish her § 1983 claims, Howe must prove that Wilson and Kusnir, (i) acted under color of state law and (ii) deprived Cipolloni of a federal right. Berger v. City of Mayfield Heights, 265 F.3d 399, 405 (6th Cir. 2001). However, "[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Stanfield v. City of Lima, 727 F. App'x 841, 845 (6th Cir. 2018) (punctuation modified). "Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." Id. (punctuation modified) "In this context, summary judgment is thus appropriate unless the evidence viewed in the light most favorable to the plaintiff, would permit a reasonable

[3] The Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." King v. City of Rockford, 97 F.4th 379, 390 (6th Cir. 2024) (punctuation modified).

**a. Excessive Force (Count I)**

Wilson and Kusnir argue they are entitled to qualified immunity as to Howe's excessive force claim. Mot. at PageID.499–507. They argue that the force used to stabilize Cipolloni was objectively reasonable because Cipolloni needed to be subdued so that a medical intervention could be undertaken. Id. at PageID.500–501. They contend that just because Cipolloni died does not mean that the force was excessive. Id. at PageID.501. Further, they say that Howe cannot show that they violated a clearly established constitutional right by placing Cipolloni on his stomach for "approximately 90 seconds" while applying "light pressure on his shoulder blade." Id. at PageID.507.[4]

The Sixth Circuit has cautioned against "treat[ing] all the challenged actions . . . as one ongoing use of force rather than as discrete episodes." Chaney-Snell v. Young, 98 F.4th 699, 725 (6th Cir. 2024) (punctuation modified). In other words, a "reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions." Morrison v. Bd. Of Trustees of Green Twp., 583 F.3d 394, 401 (6th Cir. 2009).

Although Howe's briefing is less than clear, she appears to be pointing to three instances of alleged excessive force: (i) Wilson taking Cipolloni to the ground; (ii) Wilson and Kusnir "punch[ing] Cipolloni while he was on the ground[;]" and Kusnir applying pressure to Cipolloni's back when he was fully restrained and not resisting. Resp. at PageID.1439–1440, 1442. The Court proceeds to make separate qualified immunity determinations for each of these segments.

[4] As stated above, the actual time substantiated by the record is 110 seconds. Wilson BWC at 9:30–11:20.

Before doing so, the Court must first determine the appropriate test for excessive force in the circumstances of this case. The parties utilize the factors outlined in Graham v. Connor, 490 U.S. 386 (1989). Mot. at PageID.500; Resp. at PageID.1440–1442. That test is certainly appropriate in a typical arrest situation, but the Sixth Circuit has utilized a different test where a medical emergency is involved.

In Estate of Hill by Hill v. Miracle, 853 F.3d 306, 314 (6th Cir. 2017), police responded to an emergency call involving a diabetic with low blood sugar, who was "disoriented" and "combative[,]" prompting use of a taser to stabilize the subject for emergency treatment and transportation to a hospital. The Sixth Circuit held that, in contrast to the typical case of resisting arrest, the diabetic's crisis was an "atypical situation of a medical emergency," id. at 313 (emphasis in the original), which called for "a more tailored set of factors . . . in the medical-emergency context . . . ." Id. at 314. That test requires a court to examine:

1. Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?

2. Was some degree of force reasonably necessary to ameliorate the immediate threat?

3. Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

Id.

The Hill test is appropriate here. This case was unquestionably a medical emergency, rather than a typical case of resisting arrest. The officers were attempting to stabilize an individual who was acting irrationally and out-of-control—not arresting someone suspected of criminal acts. Wilson testified that he was "trying to get medical help to him and get him secure so there could be medical help that could arrive." Wilson Dep. at PageID.1209. He used "the best of [his] verbal skill . . . to let Mr. Cipolloni know that [he] was there to help him . . . ." Id. He also summoned

medical help to the scene, so that they would be available once the situation was stabilized. Id. at PageID.1209–1210. These are the actions of law enforcement officers whose overriding concern was the health and safety of a deeply troubled individual and those in his vicinity.[5]

Using that test, the Court finds that Wilson and Kusnir's actions are protected by qualified immunity: Howe has not produced evidence to show that a constitutional violation occurred, nor has she shown that Wilson or Kusnir violated a clearly established constitutional right.

**i. Takedown**

Viewing the facts in the light most favorable to Howe, it was not excessive for Wilson to take Cipolloni to the ground. Analyzing the Hill factors, it is clear from the video that Cipolloni was experiencing a medical emergency—he was grunting, screaming for help, and preventing Wilson from accessing him by holding the door to the stairwell closed so Wilson could not reach him. See Wilson BWC at 1:55–3:35. He was also incapable of making rational decisions: Wilson repeatedly stated that he was "here to help," yet Cipolloni would not let him through the door, forcing Wilson to push the door open. Id. Cipolloni also posed an immediate threat to himself and others: the motel manager called the police because he thought that Cipolloni was preventing someone from exiting a motel room. CAD Rpt. at PageID.1206. Further, Cipolloni was screaming for help, which unquestionably signals a seriously distressed individual. Wilson BWC at 1:55–3:35.

[5] Notably, Wilson did not tell Cipolloni he was under arrest. Wilson later testified that he had probable cause for an arrest for "[t]he disturbance that I was observing in the hallway…[and] [t]he information I received from the clerk," and that Cipolloni was not free to leave. Wilson Dep. at PageID.1230. Wilson believed Cipolloni was under arrest until he "could start an investigation," id., although he did not specify what crimes he would be investigating. The gossamer nature of the potential criminal investigation and the failure to tell Cipolloni that was under arrest reinforce the conclusion that the tenor of the encounter was a medical emergency, calling for the Hill test.

As to the second factor, force was necessary to ameliorate the threat. When Wilson forced the door open, he grabbed Cipolloni and told him to get on the ground. Id. at 4:55–5:05. When Cipolloni did not immediately comply, Wilson "felt [Cipolloni] pull[ing] away[,]" requiring Wilson to force him to the ground. Id.; Wilson Dep. at PageID.1221. As to the third factor, the force was not excessive. As Wilson explained, he needed to "secure" Cipolloni so that "medical help [] could arrive." Wilson Dep. at PageID.1209. There was no constitutional violation.

Further, Howe has not shown that Wilson violated a clearly established right by taking Cipolloni to the ground for resisting him under these circumstances. Howe makes no arguments why Wilson should not have used force to take Cipolloni to the ground; nor does she cite any authority supporting that position. Howe only cites cases making broad pronouncements that there exists a clearly established right to be free from excessive force. Resp. at PageID.1442–1443.

That is insufficient. A plaintiff must present authorities of factually analogous circumstances, sufficient to put an officer on notice that his conduct violates the Constitution. See Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). That principle has been applied consistently in the excessive force context. See Dannah v. City of Grand Rapids, 176 F.4th 923, 926–928 (6th Cir. 2026) (finding no clearly established right where appellee failed to identify caselaw with facts "similar enough that it squarely governs his case.") (punctuation modified); Aaron v. King, 171 F.4th 822, 826–829 (6th Cir. 2026) (finding the same).

Wilson is entitled to qualified immunity on this alleged instance of excessive force.

**ii. Punching**

Citing Defendants' motion "regarding media file upload[,]" without any specific timestamp, Howe states that "Defendants . . . punched Mr. Cipolloni while he was on the ground." Resp. at PageID.1442. Howe's citation fails to identify which of the videos and the timestamp in the video where this alleged punch occurred. Id. The Court's review of the videos does not reveal a punch. Because Howe has failed to identify evidence in the record that supports her claim, the Court grants summary judgment to Wilson and Kusnir as to this alleged incident.

**iii. Applying pressure to the back while restrained**

Howe argues that Kusnir applying pressure to Cipolloni's back while he was restrained and not resisting is excessive force. Resp. at PageID.1441. She also argues that any denial by Kusnir that any pressure was applied to Cipolloni's back is a fact question that a jury must resolve. Id. Further, Howe argues that the force was excessive because Dearborn Police Department policy states that officers cannot use force where an individual is suspected of being under the influence of drugs. Id. at PageID.1440.

"Creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable force." Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004). But there is insufficient evidence that would allow a jury to determine that Kusnir "create[ed] asphyxiating conditions" or put "substantial or significant pressure" on Cipolloni's back during the minute or so that he was still in the prone position after he had been restrained. Therefore, the Court grants summary judgment as to this instance of alleged excessive force.

**Asphyxiating conditions**

Without citing to the record, Howe claims that Cipolloni's "breathing can slowly be heard getting fainter and fainter until it became nothing more than a deafening silence." Resp. at

PageID.1441. The Court assumes that this is the premise to Howe's argument related to "asphyxiating conditions."

Looking at the evidence presented in the record, the Court does not find sufficient evidence to demonstrate that Kusnir created asphyxiating conditions. The video does not show Cipolloni gasping for air or saying that he cannot breathe while he is handcuffed in the prone position with Kusnir's knee on his back. Wilson BWC at 10:20–11:15. As explained, the angle of the body worn camera footage does not show precisely how long Kusnir had her knee on Cipolloni, but Cipolloni was on his stomach for approximately 110 seconds. Wilson BWC at 9:30–11:20. That is the maximum time Kusnir's knee could have been on his back.

Further, none of the medical experts found that Cipolloni experienced or died from asphyxiating conditions. The Wayne County Medical Examiner opined that the cause of death was from cocaine and fentanyl toxicity. Medical Examiner Report at PageID.1316 (Dkt. 45-2). These facts support the conclusion that Cipolloni did not experience asphyxia.

Dr. David Donaldson, D.O., another medical expert, opined that Cipolloni died from "a lethal cardiac dysrhythmia caused in part by a prolonged QTc, which is an abnormality in the heart's electrical charge. Prolonged QTc is strongly correlated with drug abuse, particularly cocaine." Donaldson Rpt. at PageID.1330 (Dkt. 45-2).

Brian Williamson, M.D. opined that it was "[m]ore likely than not, the combination of drugs of abuse-cocaine, alcohol, and fentanyl, mixed with prescription drugs of trazodone and hydroxyzine, and a low potassium level, with an underlying susceptibility to QT prolongation, led to Mr. Cipolloni's sudden death." Williamson Rpt. at PageID.1336 (Dkt. 45-2).

Howe's medical experts do not directly disagree. Instead, they object to Defendants' experts not considering other possible conclusions for Cipolloni's death—including the lack of

oxygen. See Diaz Rpt. at PageID.1560 (Dkt. 54-13) ("[T]he immediate cause of death was irregular rhythm of the heart triggered by lack of oxygen and that should have been taken into consideration for the determination of the cause of death and the classification of the manner of death."); Cassian Rpt. at PageID.1570 (Dkt. 54-14) (opining that there are "[t]wo other possible conclusions" to the medical examiner's cause of death explanation to explain Cipolloni's death, "either effected by the combination of acute drug-induced psychosis and cardiac arrest during the altercation or was produced by traumatic asphyxia during the struggle").

Importantly, neither Diaz nor Cassian explicitly state that Cipolloni's death was caused by asphyxiation caused by Kusnir placing one knee on his back. See Diaz Dep. at PageID.1347 (Dkt. 45-2) (Q: "So your conclusion was that the immediate cause of death was an arrhythmia, agreed?" A: "Yes." Q: "In other words, Mr. Cipolloni did not die from positional asphyxia, agreed?" A: "Yes.").

There is no evidence in the record to show that Kusnir created asphyxiating conditions—just that she could have. To withstand a summary judgment, a plaintiff "must do more than . . . identify a 'metaphysical doubt' or hypothetical 'plausibility' based on a lack of evidence; she is obliged to come forward with 'specific facts,' based on 'discovery and disclosure materials on file, and any affidavits,' showing that there is a genuine issue for trial." Chappell v. City Of Cleveland, 585 F.3d 901, 912 (6th Cir. 2009) (finding no genuine issue of material fact because plaintiff failed to produce sufficient evidence of excessive force refuting the detectives' account).

**Substantial or significant pressure**

Howe's argument regarding "substantial or significant pressure" contains the same flaws—there is no evidence showing that Kusnir did put substantial or significant pressure on Cipolloni's back, just that she could have.

First, the evidence from Wilson's body worn camera which shows Kusnir's right knee on Cipolloni's back, is inconclusive. Wilson BWC at 10:22–11:20. Kusnir's left knee is on the ground. Id. However, it is unclear from the video how much, if any, pressure is being applied.

Second, Kusnir testified that she "put [her] right leg acrossed [sic] [Cipolloni's] shoulder blade to try to hold him in position" while Wilson handcuffed him. Kusnir Dep. at PageID.1266 (Dkt. 45-2). And that Cipolloni was "on his stomach at the time [her] leg was acrossed [sic] his shoulder." Id. at PageID.1267. Kusnir stated that she did not have "all her weight on his back" and that "[t]he majority, if not all of [her] weight, was actually on [her] left leg which was on the ground." Id. at PageID.1267, 1271–1272. In other words, she testified that she did not put her full weight on his back.

Howe tries to aggrandize the pressure put on Cipolloni's back. Citing Diaz's report, Howe mentions the hematomas found on Cipolloni as "clear evidence that he was forcefully restrained with adult body weight applied to his back." Resp. at PageID.1435. But there is no evidence that the hematomas were caused by Kusnir's leg being placed on Cipolloni's back.

The medical examiner, Dr. Sung, found that there were five bruises on the "left side and left lumbar back" but that "[t]hese injuries did not contribute to death." Medical Examiner Report at PageID.1316. This would support the conclusion that the pressure from Kusnir's leg was not significant or substantial.

Diaz's report does not state that the hematomas on Cipolloni's back show that Kusnir applied significant or substantial pressure. In garbled fashion, his report states:

> Reviewing the documents, footage, both autopsies, it is clear that Mr. Cipolloni was forcefully restrained and is evident by the multiple hematomas on the back that indicate that he was restrained, and the weight of adults was applied to his back. A similar case of forceful restraint with similar contusions/hematomas in [sic] the back.

Diaz Rpt. at PageID.1560.

It is unclear whether Diaz was opining that the hematomas resulted from pressure on the back. But he does not say that the hematomas were caused by pressure from Kusnir's placement of her knee.

What is clear is that Diaz did not know how much pressure was placed on the back. This was established at his deposition, when he was questioned about his report:

> Q: Is it your position that multiple police officers applied weight to his back at the same time?
>
> A: No, and I don't know that for sure, and the honest answer, that's why I put it in generic, the weight of adults [sic]. More correctly it should have been adult within bracket S. I think that would have been a better descriptor. . . .
>
> Q: So as you sit here today, you're aware of one officer kneeling on Mr. Cipolloni, right?
>
> A: Yes.
>
> Q: All right. And again, back to that quote, and the weight of adults was applied to his back, how much weight was applied?
>
> A: Well, the weight—I'm not a physicist. I cannot make a comment but imagine you putting yourself in that predicament or that position and then somebody, an adult, is kneeling over restraining. It's a force that is applied, and what happens in these type of cases, it creates a mechanical—it precludes mechanically from the chest cavity to expand and retract and that's what creates a chain of medical events that leads to a cardiovascular collapse separate and apart from substances that the person may have.
>
> Q: Doctor, my question was how much weight was applied to his back?
>
> A: I cannot tell you. You know, imagine an adult kneeling on the—
>
> Q: You don't know how much weight was applied to his back, right?
>
> A: No. No.

Diaz Dep. at PageID.1344.

Howe argues that the dispute about how much pressure Kusnir put on Cipolloni's back is the "very quintessence of a question of fact." Resp. at PageID.1441. Howe would be right if each side had presented evidence of the degree of force, thus requiring a jury to choose which side's evidence to believe. But Howe has not put forward any evidence that Kusnir put significant or substantial pressure on Cipolloni's back. Howe would have a jury speculate that the hematomas were caused by Kusnir's leg placement on Cipolloni's back, rather than other contact during the encounter. Notably, Cipolloni wrestled with Wilson and also pressed his own body forcefully against a door to keep Wilson at bay, making both of those incidents a possible explanation for his bruising. See Wilson BWC. Simply put, there is no evidence linking the hematomas to Kusnir's knee. And that means that there is no evidence showing Kusnir (or Wilson for that matter) exerted significant pressure. Howe would be asking a jury to guess, and such a speculative line of logic is insufficient to withstand summary judgment. Chappell, 585 F.3d at 912 (hypothetical plausibility insufficient to get past summary judgment).

Lastly, Howe argues that Dearborn Police Department policy precludes the use of force against individuals "who officers suspect to be using drugs." Resp. at PageID.1440. Howe does not cite to where in the policy this rule exists. Id. The Court's review of the policies that Howe attaches to her brief shows that the policy is not as abstentious as Howe claims. Regarding an individual suspected to be under the influence of drugs and force, the Use of Force policy states:

> [a] subject may not be capable of understanding the situation because of a medical condition, a mental, physical or hearing impairment, a language barrier, drug interaction, or emotional crisis, and have no criminal intent. These situations may not make the subject any less dangerous, but understanding the subject's situation may enable officers to calm the subject and allow the use of de-escalation techniques while maintaining public and officer-safety.

Dearborn Police Use of Force Policy at PageID.1495 (Dkt. 54-10).

There is nothing in that language that bars the use of force against suspected drug users.

Furthermore, violations of internal policy, in and of itself, do not amount to a constitutional violation. Meier v. Cnty. of Presque Isle, 376 F. App'x 524, 529 (6th Cir. 2010). Howe presents no authority that would require an officer to totally abstain from the use of force just because a subject was thought to be on drugs. Such blanket abstention would be nonsensical, given that individuals on drugs present dangers to themselves, to others, and to officers on the scene who must utilize force to stabilize an out-of-control subject.

Because Howe fails to show a disputed issue of fact regarding the three claimed acts of excessive force, the Court grants summary judgment as to Wilson and Kusnir on Howe's claim of excessive force.[6]

**b. Deliberate Indifference (Count II)**

Howe brings her deliberate indifference claim under the Fourth and Fourteenth Amendments. Compl. at PageID.9–13. Without raising qualified immunity, Wilson and Kusnir argue that they were not deliberately indifferent to Cipolloni's medical needs under either the Fourth or Fourteenth Amendments. Mot. at PageID.507–509. For the following reasons, the Court grants summary judgment to Wilson and Kusnir on this claim.

As an initial matter, the Sixth Circuit has held that there is no Fourth Amendment right to medical care. Colson v. City of Alcoa, 37 F.4th 1182, 1189 (6th Cir. 2022). Therefore, Howe's Fourth Amendment deliberate indifference claim is dismissed.

As for the Fourteenth Amendment claim, Wilson and Kusnir first argue that Howe's claim is not "cognizable on these facts," because the claim "makes little sense in a situation where the

---

[6] Throughout her brief, Howe asserts that Defendants "escalated" the situation by using force. Resp. at PageID.1423, 1425, 1430. The Sixth Circuit instructs the Court to "consider all prior events . . . in determining whether a particular use of force was reasonable." Romeo v. City of Lansing, 159 F.4th 1002, 1009 (6th Cir. 2025). Even so, the Court does not find that any of Wilson and Kusnir's actions escalated the use of force.

period of custody is only a few minutes long." Id. at PageID.507–508. They do not further explain this argument. Id. The Court will not consider arguments "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation. . . ." McPherson v. Kelsey, 125 F.3d 989, 995 (6th Cir. 1997).

Under the Due Process Clause of the Fourteenth Amendment, pretrial detainees have a constitutional right to be free from deliberate indifference to their serious medical needs. Greene v. Crawford Cnty., 22 F.4th 593, 605 (6th Cir. 2022). To prevail on a Fourteenth Amendment deliberate indifference claim, Howe "must show (1) that [Cipolloni] had a sufficiently serious medical need and (2) that each defendant 'acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." Helphenstine v. Lewis Cnty., 60 F.4th 305, 317 (6th Cir. 2023) (quoting Brawner v. Scott Cnty., 14 F.4th 585, 596 (6th Cir. 2021) (punctuation modified)).[7]

There is little question that Cipolloni had an objectively serious medical need to support a medical indifference claim. The plaintiff must show that the need was "sufficiently serious," such that its neglect constituted a significant deprivation. Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 895 (6th Cir. 2004) (punctuation modified). A "condition resulting in death" generally suffices. Howell v. NaphCare, Inc., 67 F.4th 302, 311–312 (6th Cir. 2023). Here, the video shows Cipolloni acting erratically, groaning, and shouting for help. See Wilson BWC. Further, Wilson and Kusnir both testified that Cipolloni may have been experiencing a medical situation. Wilson

[7] The Sixth Circuit's recent decision in Poynter v. Shirley, No. 25-5188, 2026 WL 2641092 (6th Cir. Sept. 8, 2026), even if applicable, does not change this result. In Poynter, the Sixth Circuit returned to the subjective prong for deliberate indifference outlined in Farmer v. Brennan, 511 U.S. 825 (1994), which requires a court to evaluate whether there was a substantial risk of harm that the defendant knew about and disregarded. Poynter, 2026 WL 2641092 at *7 (citing Farmer, 511 U.S. at 837–838). As explained below, Howe fails to supply any evidence of subjective state of mind, so the claim fails whether the court applies Poynter or Brawner.

Dep. at PageID.1209–1210 ("I knew that there was—could have been a possible medical situation going on."); Kusnir Dep. at PageID.1266 (Q: "At any point in your encounter with Mr. Cipolloni did you suspect he may be on drugs?" A: "It was a possibility, yes." Q: "Okay. And what was he exhibiting to you that led you to the conclusion he might be on drugs?" A: "How long he had been resisting [] Wilson, and then myself once I arrived on the scene, not—like making odd noises that I can't really describe in much more detail about . . . .").

Despite Cipolloni's objectively serious medical need, Wilson and Kusnir are entitled to summary judgment because Howe cannot establish that they had a culpable state of mind. Howe makes no arguments related to state of mind. See Resp. at PageID.1448. And the Court does not see any evidence of a culpable state of mind in the record.

To the contrary, the record shows that Wilson and Kusnir did not have the requisite mental state. Even before Wilson engaged with Cipolloni, he radioed for rescue to "stand by." Wilson BWC at 2:15–2:24. This demonstrates that he understood that Cipolloni would likely need medical attention. Also, once Wilson and Kusnir realized that Cipolloni was unconscious, they immediately took steps to get Cipolloni medical care. Within a minute of realizing that Cipolloni was unconscious, they were directing other officers on the scene to retrieve Narcan, radioing for rescue to "step it up;" and rubbing Cipolloni's chest and telling him to wake up. Wilson BWC at 11:20–12:27; Kusnir BWC at 5:25–6:00. There was no untimeliness in getting Cipolloni evaluated by medical staff. These actions can hardly be described as acting deliberately and recklessly in the face of an unjustifiably high risk of known or obviously known harm. Helphenstine, 60 F.4th at 317. No reasonable juror could find otherwise based on the facts viewed most favorably to Howe.

Thus, Wilson and Kusnir are entitled to summary judgment as to Howe's deliberate indifference claim.

**c. Failure to Intervene (Count III)**

"Section 1983 generally prohibits a plaintiff from holding one officer liable for another's actions[,]" however, "an officer who fails to intervene to prevent another officer's excessive force can face liability for that force under § 1983." Chaney-Snell, 98 F.4th at 721. There can be no failure to intervene if there is no underlying unconstitutional conduct. Bonner-Turner v. City of Ecorse, 627 F. App'x 400, 413 (6th Cir. 2015). Because the Court has found no unconstitutional conduct, the Court grants summary judgment as to Howe's failure to intervene claims in Count III.

**d. Monell Claim (Count IV)**

Howe's Monell claim against the City of Dearborn alleges that the City failed to train its officers and/or failed to affirmatively ensure its officers followed its policies. Resp. at PageID.1449. The City of Dearborn argues that because there was no constitutional violation, Howe's Monell claim fails. Mot. at PageID.509.

The Court agrees with the City. "There can be no [municipal] liability under Monell without an underlying constitutional violation." Robertson v. Lucas, 753 F.3d 606, 622 (6th Cir. 2014) (citing Scott v. Clay Cty., 205 F.3d 867, 879 (6th Cir. 2000)). Therefore, the Court grants summary judgment to the City as to this claim.

**B. State-Law Claim (Count V)**

In addition to her federal claims, Howe brings a gross negligence claim under Michigan law (Count IV). Because the Court grants the Defendants' motion for summary judgment as to all of Howe's federal claims, the Court declines to exercise supplemental jurisdiction over the state-law claim and dismisses it without prejudice. 28 U.S.C. § 1367(c)(2); Brooks v. Rothe, 577 F.3d

701, 709 (6th Cir. 2009) ("If the federal claims are dismissed before trial, the state claims generally should be dismissed as well.").

## III. CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion for summary judgment as to the federal claims, but denies it as to the state-law claim, which is dismissed without prejudice. The case is now closed.

**SO ORDERED.**

Dated: September 25, 2026
Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 25, 2026.

s/Joseph Heacox
JOSEPH HEACOX
Case Manager